### STATE OF CONNECTICUT *v.* SHAWN ROBINSON
### (11350)

DUPONT, C. J., and O'CONNELL and LANDAU, Js.

Argued January 11—decision released June 29, 1995

*Deborah L. DeHart,* with whom, on the brief, were *William H. Narwold* and *Lynn A. Addington,* for the appellant (defendant).

*Nancy L. Gillespie,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David J. Strollo,* assistant state's attorney, for the appellee (state).

DUPONT, C. J. The defendant appeals from a judgment of conviction, rendered after a jury trial, of two counts of the crime of assault in the second degree in violation of General Statutes § 53a-60. He claims that he was denied a right to a fair trial by the trial court's words and conduct, and that the state's use of two peremptory challenges violated his right to equal protection under the law as explicated in *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We conclude that the defendant was given a fair trial but remand this matter for a hearing as to the exercise of one of the peremptory challenges.

I

FAIR TRIAL

The defendant claims that he was deprived of a fair trial because the trial court improperly (1) made refer-

ence to the fact that security in the courtroom was a result of the war in the Middle East, (2) laughed at him, and (3) allowed him to be shackled during the course of the trial. The defendant asserts that the trial court's comments and the high level of security in the courtroom, when taken as a whole, prejudiced him and denied him the right to a fair trial. If the defendant were to prevail on this claim, he would be entitled to a new trial; *State* v. *Couture*, 194 Conn. 530, 564–65, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); and we would not need to reach the defendant's claim that the use of peremptory challenges violated his right to equal protection.

The defendant argues that the trial court made improper reference to the war in the Middle East in that part of its charge concerning the heightened security in the courtroom. The defendant claims that he was prejudiced by this comment because the jury was aware of the fact that he was a Muslim.

In its charge to the jury, the trial court stated, "In addition, I wanted to say something about the security in the courtroom. You know, we're a very security conscious society. Right now, because of the war, there's security all over. Mr. Robinson has made no secret of the fact that he is an inmate in a correctional institution. There are certain policies and procedures followed in cases like this and I don't want you to draw any kind of an inference that anything you saw related to any security measures taken in this courtroom or any intimation of the guilt or nonguilt of Mr. Robinson. It has no bearing whatsoever on the ultimate issue here that you're going to be deciding."

The defendant objected to the trial court's reference to the war. Thereafter, the trial court called the jury back and stated, "Counsel has asked me to correct one

false impression that I might have left with you. I want to be absolutely certain that you understand that any reference I make to security or the war has absolutely nothing to do with this case. Nothing whatsoever. I was just speaking generally. And I want to just impress on you that you were not to associate any security measures that have been taken in this courtroom with any indication of the guilt or nonguilt of the defendant. It has absolutely nothing to do with it whatsoever and obviously any measures that we have taken here have nothing whatsoever to do with the war. I just wanted to correct that."

The trial court's comments did not prejudice the defendant. First, we cannot assume that the jury knew the defendant's religious affiliation. The defendant has not provided a reference to any part of the transcript to show that the jury knew of the defendant's religion. The defendant references his own comment to the trial court, outside the presence of the jury, that the jury knew he was a Muslim, and his own comment during a hearing on a postverdict motion.[1]

Further, even if the jury was aware of the defendant's religion, the trial court's statements indicate that it referenced the security precautions taken because of the war in the Middle East simply as an example of society's general security consciousness. It is unlikely that any juror would understand the court's general comment to be related to the religious affiliation of the defendant.

Next, the defendant claims that he was prejudiced because the trial court allegedly laughed at him. The defendant discusses this issue in only one sentence of his brief and his only reference to the transcript is from

[1] The defendant cited to a portion of transcript not provided to this court. We assume that the defendant's statement made in the hearing on the postverdict motion is the reference that he intended.

the hearing on a postverdict motion where the trial court stated, "I do remember one occasion when everybody in this room laughed and I'm sorry to say that I joined in."[2] It is impossible from this statement to know the reason for the laughter, and to assess the merits of the defendant's claim.

The defendant next asserts that the high level of security in the courtroom throughout the trial served to create a prejudicial atmosphere, thereby depriving him of a fair trial. Prior to voir dire, the trial court conducted a hearing to determine whether the defendant should be restrained during trial. The first witness to testify was a sheriff who recalled an incident that occurred while the defendant was in a holding cell at the courthouse, wearing handcuffs and leg irons, with a gag in his mouth. The defendant had smashed his head through a window, picked up a piece of broken glass and threatened sheriffs with the glass.

The trial court also admitted into evidence the transcript of summary contempt proceedings from a previous mistrial of this case where the trial court had described incidents that occurred during that trial. The court stated that the "[d]efendant Mr. Shawn Robinson in the process of the voir dire examination interrupted the voir dire examination with contemptuous comments to the court. He specifically indicated 'Hey man, I got to go to the bathroom' and refused to participate further in the voir dire. He refused to return to the courtroom after a recess was granted. When he was escorted back into the courtroom by the sheriffs he refused to sit down when directed by the court. He was shouting in a loud and belligerent manner. He refused to stop shouting when directed to do so by the

---

[2] This is not the transcript reference that the defendant provided in his brief. The page referenced by the defendant does not indicate laughter or any reference to laughter. Again, we are left to assume that the defendant intended to reference the part of the transcript to which we refer.

court. He refused to stop talking when directed to do so by the court. . . . It was reported to the court that there was an incident at the jail in which three sheriffs were injured by this defendant and he was unable to be brought to the court." The state then brought to the attention of the court other alleged incidents of violent behavior by the defendant, including the fact that, in this case, the defendant was accused of assaulting two correction officers while incarcerated at the John R. Manson youth institution.

The trial court then decided that the defendant should remain shackled with his hands loosely cuffed to his belly irons, but without close handcuffs. During the trial, the court modified its original ruling by ordering that the defendant's writing hand be free and, then, ordering that both hands be free. The court had a barrier constructed to conceal the physical restraints from the jurors. Correction officers in charge of the defendant sat or stood near him in the courtroom.

The defendant claims that his right to a fair trial was violated by these security measures. "As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom. . . . Nonetheless, a defendant's right to appear before the jury unfettered is not absolute. . . . A trial court may employ a reasonable means of restraint upon a defendant if, exercising its broad discretion in such matters, the court finds that restraints are reasonably necessary under the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 505, 594 A.2d 906 (1991).

"In reviewing the defendant's claims concerning shackling, our standard of review is whether the trial court abused its sound discretion in acting as it did. . . . The trial court's discretion on the issue of shackling is 'broad.' . . . It is for the trial court to consider all the circumstances to accommodate fairly the defendant's right to the indicia of innocence before the jury as well as the competing rights of participants in the courtroom and society at large." (Citations omitted.) *State* v. *Woolcock*, 201 Conn. 605, 615, 518 A.2d 1377 (1986).

Here, the trial court did not abuse its discretion by ordering the security measures and causing the defendant to be restrained. The defendant had exhibited a history of violent behavior. This violent behavior had been directed toward sheriffs and the court and had occurred in the courthouse. Further, the trial court attempted to conceal the restraints from the sight of the jury and adjusted the restraints after personally observing the defendant in the courtroom.

Finally, the defendant asserts that the cumulative effect of the trial court's comments and the heightened security deprived him of a fair trial. Our previous conclusions concerning the court's comments and security measures lead us to reject this claim. " 'We decline to create a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts.' " *State* v. *Robinson*, 227 Conn. 711, 747, 631 A.2d 288 (1993).

We conclude that the defendant was not denied his right to a fair trial.

## II

### EQUAL PROTECTION

Two peremptory challenges of the state are at stake. One of them involves a question of first impression,

namely, whether a request by a defendant for a *Batson* hearing is timely when not made immediately following the voir dire of the venireperson who the defendant claims was improperly challenged.

The defendant is black. Of the first thirty-eight venirepersons called for jury selection,[3] three were black. One of those three was excused by the court for hardship, and the other two, Lisa Spruill and Melvin Perry, were excused by the state through the use of peremptory challenges.

Spruill was the second person voir dired and Perry the thirty-eighth person voir dired. The defendant did not object on the basis of *Batson* v. *Kentucky*, supra, 476 U.S. 79, immediately after the state used a peremptory challenge to excuse Spruill, but the defendant did object on that basis as to Spruill and Perry immediately after the state excused Perry, and moved that the entire venire panel be dismissed. When the defendant made his *Batson* claim, he asked the state to put on the record its reasons for excusing both Perry and Spruill.

The state asserted that it excused Perry for two reasons. First, the state felt that a comment made by Perry, "it takes two to fight," indicated that Perry would be lenient about fights and that Perry thought that no one was solely at fault for a fight. Second, the state was concerned with the fact that Perry had a fourth grade education, whereas the other jurors that had been selected had at least high school educations. The state was asked by the court if it wanted to put anything on the record as to Spruill, and the state declined, stating that the defendant had not made a *Batson* claim as to her immediately following her voir dire. The court did not require the state to put on the record its reasons for excusing Spruill.

---

[3] Sixty-eight venirepersons were questioned before a jury was selected.

When the defendant requested a ruling on his motion to dismiss the venire panel because of the exclusion of both Perry and Spruill, the court stated that it was premature to rule because not enough had developed for it to be able to find any prejudice. The defendant continued to argue his claim on statistical grounds, raising the fact that the state had struck "a hundred percent of the people in the cognizable [racial] group," and that the state had, therefore, excused a disproportionate number of black venirepersons.

The court found that the state's reasons for the challenge of Perry were not pretexts and inferentially that the defendant had not satisfied his burden of proof that the striking of Perry was racially motivated. The court made no ruling as to Spruill because the defendant had not objected when she was excused. In short, no *Batson* hearing was held as to Spruill.

The court never specifically ruled on the defendant's motion to dismiss the entire venire panel but implicitly denied it because it found the peremptory challenge as to Perry was not racially motivated and that no *Batson* hearing was needed as to the peremptory challenge of Spruill because the defendant's claim as to her was untimely. After the trial court had concluded, the defendant filed a motion for a new trial based on his *Batson* claims. The court denied that motion.

The defendant argues that the trial court violated his state and federal constitutional rights to equal protection by failing to find that the peremptory challenge of Perry was racially motivated and by failing to hold a *Batson* hearing as to the peremptory challenge of Spruill. He seeks a new trial.

The Connecticut constitution "grants [litigants] a right to challenge prospective jurors peremptorily. Conn. Const., art. I, § 19. Nevertheless, Connecticut's . . . jury selection procedures . . . must comply with

the strictures of the federal constitution. . . . Thus, while Connecticut litigants still have a state constitutional right to use peremptory challenges, the extent of that use is now limited by the equal protection clause of the federal constitution . . . ." (Citations omitted.) *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 225, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994).

In *Batson* v. *Kentucky*, supra, 476 U.S. 89, the United States Supreme Court held that "the Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." See *State* v. *Hinton*, 227 Conn. 301, 323, 630 A.2d 593 (1993). "[T]he striking of even one juror on the basis of race violates the equal protection clause . . . ." *State* v. *Gonzalez*, 206 Conn. 391, 400, 538 A.2d 210 (1988).

The first step in a *Batson* hearing requires the defendant to establish a prima facie case of discrimination.[4] The necessity of establishing a prima facie case, however, has been obviated in Connecticut. A defendant, who is a member of a cognizable racial group is entitled to a hearing based on the principles of *Batson* if he requests one and if the prosecutor exercised a peremptory challenge to excuse a member of the defendant's race from the jury panel.[5] *State* v. *Holloway*, 209 Conn.

[4] In order to establish a prima facie case, a defendant must show that he is a member of a cognizable racial group, that the prosecutor has exercised peremptory challenges to excuse members of the defendant's race from the jury panel, and any other relevant circumstances that raise an inference that the prosecutor used the challenge to exclude on the basis of race. *Batson* v. *Kentucky*, supra, 476 U.S. 96; *State* v. *Holloway*, 209 Conn. 636, 641, 553 A.2d 166, cert. denied, 490 U.S. 1071, 129 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

[5] A *Batson* claim has now been applied to situations involving groups other than cognizable racial groups and other than when the defendant and the venirepersons are members of the same cognizable group. See generally,

636, 646 n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 129 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

In the second step of *Batson,* the burden shifts to the prosecutor to articulate a race neutral explanation for striking the juror in question. *Batson* v. *Kentucky,* supra, 476 U.S. 97. "A neutral explanation . . . means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez* v. *New York,* 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). The prosecutor's explanation need not rise to the level necessary to justify exercise of a challenge for cause. *Batson* v. *Kentucky,* supra, 97. The prosecutor may not, however, rebut the defendant's prima facie case by stating merely that the peremptory challenge was exercised on the assumption or on intuitive judgment that the prospective juror would have been partial to the defendant because of shared race. Id. Moreover, "[i]f a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Hernandez* v. *New York,* supra, 363. The exercise of a peremptory challenge, however, will not be held unconstitutional solely because it results in a racially disproportionate jury. Id., 361.

In the third step of *Batson,* after the state has articulated a race-neutral reason, the defendant, in order to prevail, must show by a preponderance of the evidence that the prosecutor exercised a peremptory chal-

*State* v. *Rodriguez,* 37 Conn. App. 589, 658 A.2d 98 (1995). The need to establish a prima facie case, therefore, in these situations is also obviated.

lenge discriminatorily.[6] *State* v. *Gonzalez*, 206 Conn. 391, 399–400, 538 A.2d 210 (1988). The type of evidence that is relevant to a showing of discrimination includes, but is not limited to, the following examples: "(1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not struck . . . (5) the prosecutor advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race." (Citations omitted; internal quotation marks omitted.) Id., 399.

The trial court has the obligation of determining whether the defendant has established that the state's reasons were insufficient or pretextual. This ultimate question is one of intent and is a question of fact that turns on the court's evaluation of the state's credibility. *State* v. *Hinton*, supra, 227 Conn. 301. The finding of fact by the court is entitled to great deference, and we may not reverse the trial court's finding as to whether intentional discrimination caused the exercise of the peremptory challenge unless the finding is clearly erroneous. Id.

---

[6] The United States Supreme Court has made it clear that steps two and three of a *Batson* hearing, namely the recitation by the state of a race-neutral reason that is facially valid, and the proof by the defendant that the strike was discriminatory cannot be merged. *Purkett* v. *Elem*, U.S. , 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834 (1995). If a race-neutral reason is given that does not facially deny equal protection, even if it is unpersuasive or even "silly," the hearing must proceed to step three. Id.

A defendant may *waive* his equal protection right to be free of discriminatory peremptory challenges, as well as *his* right to assert the interest of a prospective juror to participate in the trial. Conversely, he may *assert* his own right to have, as well as the right of prospective jurors to be part of, a race neutral jury. *State* v. *Patterson*, 230 Conn. 385, 392, 645 A.2d 535 (1994).

"[B]y failing to object in a timely manner, the defendant is ordinarily deemed to have waived his equal protection right against racially motivated peremptory challenges under *Batson* v. *Kentucky*, supra, 476 U.S. 79. . . . Timely objection serves to avoid prejudicial error by permitting the trial court and the prosecutor to reconsider and perhaps change their courses of conduct while that is still possible. . . . In addition, timely objection serves to preserve an adequate record for appeal. . . . As the United States Supreme Court has stated, ' "[n]o procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right." ' " (Citations omitted.) Id., 392–93; see also *State* v. *Rodriguez*, supra, 37 Conn. App. 589.

The determination of whether a *Batson* objection to a peremptory challenge by the state must be made immediately following the exercise of the challenge or else be waived is an issue of first impression in Connecticut. In *State* v. *Hinton*, supra, 227 Conn. 301; *State* v. *Smith*, 222 Conn. 1, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Holloway*, supra, 209 Conn. 636; *State* v. *Gonzalez*, supra, 206 Conn. 399–400; and *State* v. *Rodriguez*, supra, 37 Conn. App. 589, the peremptory challenges in question were the subject of a *Batson* hearing, at the request of the defendant, immediately following the exercise of each challenge by the state. In *Patterson*, supra, 230 Conn. 385, the defendant never objected,

for himself or on behalf of a prospective juror, at any time during the trial and thus was deemed to have waived his right to do so. These cases do not serve as guidance to determine whether the defendant here waived his *Batson* right because it was not timely made.

The only Connecticut case that even obliquely addresses the issue of whether a *Batson* claim must be made immediately after the voir dire has been completed or be deemed waived is *State* v. *Wylie*, 10 Conn. App. 683, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987), where the objection to three peremptory challenges made by the state to three black venirepersons was made after all jurors and one alternate juror had been selected. Without any discussion of timeliness, and without any claim of the state that the objection was untimely, the trial court held that the state's articulation as to the venirepersons excused was race-neutral. In that case, however, unlike the present case, the trial court required articulations and made findings as to the race-neutral content of the articulation that could be reviewed by us.

There are three times when a defendant may object to a peremptory challenge and request a *Batson* hearing. One is immediately following the voir dire of the member of the cognizable group who is the subject of the claimed discrimination. Another is when the defendant becomes aware or should have become aware that a prior peremptory challenge was improper, and the third time is at the conclusion of the selection of the jury panel but before the jury is sworn. When a defendant should be required to claim a *Batson* hearing or have deemed it waived depends on a number of factors, such as the difficulty of applying the requirement, whether there is a constitutional or a statutory right to peremptory challenges and individual voir dire, and whether a defendant is given the benefit of an inference of discrimination without the necessity of showing a prima

facie case as soon as a peremptory challenge is used to excuse a member of the particular cognizable group at issue.

Other jurisdictions have held that a *Batson* claim will be timely if made before the jury is sworn, even if it is made after all the jurors have been selected. *Baxter* v. *United States*, 640 A.2d 714 (D.C. App. 1994); *Tursio* v. *United States*, 634 A.2d 1205 (D.C. App. 1993); *Wright* v. *State*, 186 Ga. App. 104, 366 S.E.2d 420 (1988); *Stanley* v. *State*, 313 Md. 50, 542 A.2d 1267 (1988). These cases from other jurisdictions are helpful but not determinative because they arise in the federal courts or in states that do not have constitutional and statutorily protected rights to peremptory challenges and to individual voir dires[7] and in states that have not eliminated the necessity of making out a prima facie case before proceeding to the state's articulation of race-neutral reasons.

The individual voir dire in Connecticut makes it less necessary for a defendant to wait until the end of jury

---

[7] The constitution of Connecticut, article first, § 19, as amended by amendment four, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

selection before making a *Batson* claim because the likelihood of the improper use of a peremptory challenge may be known as soon as the voir dire is complete. In jurisdictions where not all venirepersons are individually questioned, with the voir dire being conducted by the court, some jurors may not answer any questions at all, making it impossible to know that a *Batson* claim exists as each juror is accepted.

The right to an individual voir dire as defined and practiced in Connecticut makes it likely that the time between the first voir dire and the last is not a matter of hours, but of days, weeks or even months. When the time between the choosing of the first and last juror is short, the state can better articulate its race-neutral reasons and the defendant can more easily satisfy his burden of proof as to the discriminatory nature of the peremptory challenge.

The elimination of the necessity of making a prima facie case of discrimination also has an effect on the timeliness of the claim. If there must first be a showing by a defendant of a prima facie case, the second and third steps of a *Batson* hearing might never be necessary because the lack of discrimination may be apparent if the defendant cannot make out a prima facie case, causing a court to find that the defendant is not entitled to the inference of discrimination. Conversely, the state may realize the lack of strength in the race-neutral articulation it would have made because of the strength of the defendant's prima facie case and withdraw its peremptory challenge prior to an attempt to articulate its race-neutral reasons which also would make it unnecessary to have a full scale *Batson* hearing. If there need be no showing of a prima facie case, as is true in Connecticut, a defendant is entitled to a *Batson* hearing by simply asking for one if the challenged venireperson is a member of a cognizable group protected from the use of a discrimina-

tory peremptory challenge, making it easier for a defendant to object to the challenge at an earlier time.

There is certain evidence of discrimination that is, or should be, apparent to a defendant at the time the state uses a peremptory challenge. For example, if the prosecutor fails to question the challenged juror or questions him or her in only a perfunctory manner, defense counsel should recognize this fact at the time the potential juror is being voir dired, and should assert his *Batson* claim immediately after voir dire of that juror. There are also circumstances, however, in which the defendant may not recognize the possibility of discrimination until the questioning of another prospective juror sometime later in the jury selection process. For example, if the first prospective juror of a minority race is asked a question to elicit a particular response that is not asked of the other venirepersons of other races who are subsequently questioned, or if persons with the same or similar characteristics but not the same race as the challenged juror are not struck, the possible discrimination would not be apparent until the subsequent venirepersons are voir dired and chosen. There is, thus, a lack of empirical data in some instances until a comparison of voir dires can be made by a defendant. Also, until a disproportionate number of peremptory challenges are exercised to excuse members of a minority race, the defendant may not be aware of the discriminatory nature of an earlier peremptory challenge or challenges. The defendant cannot be expected to be clairvoyant in determining whether to seek a *Batson* hearing if the patterns that might eventually show discrimination have not yet occurred.

Allowing a defendant to seek a *Batson* hearing at the time a pattern of possible discrimination has emerged, which necessarily may occur long after the individual voir dire of the juror in question has been completed, creates difficulties. See *United States* v. *Biaggi*, 909

F.2d 662 (2d Cir. 1990); *Tursio* v. *United States,* supra, 634 A.2d 1210. It may be too late to take corrective measures such as seating the juror who was excused for improper reasons and it may make it difficult for the state to reconstruct honest race-neutral reasons if the challenge occurs long after the excusal. To deem the *Batson* right waived, however, unless made immediately following voir dire, may make it impossible for defendants to prove by a fair preponderance of the evidence that the state has exercised a peremptory challenge discriminatorily because they will not have the benefit of a comparative review of the voir dires to come. We recognize, therefore, that whatever time we require a defendant to exercise his right to seek a *Batson* hearing or be deemed to have waived it, has a Scylla and Charybdis aspect.

All of the factors as hereinabove discussed are involved in our conclusion that the defendant should have asked for a *Batson* hearing at that point in the voir dire proceedings when the possibility of purposeful discrimination became or should have become apparent. The point at which that occurred in this case is a question of fact for the trial court to determine.[8] It was not necessary for the defendant to wait until the state exercised its next peremptory challenge after Spruill to excuse another member of the same cognizable group before he could assert a *Batson* claim. There are instances where the comparative data from subsequent individual voir dires of others who are not members of the same group would make a defendant aware that a peremptory challenge previously made by the state may have been purposeful discrimination.

Here, the defendant raised a *Batson* claim with regard to the state's excusal of Spruill at the time that

---

[8] In future cases, the procedure outlined, infra, will make this determination unnecessary.

the defendant objected to the state's challenge of Perry. Earlier comparative data of other voir dires may have made the time ripe for a request for a *Batson* hearing prior to Perry's voir dire. At the time of Spruill's excusal, however, there was no reason apparent on the record before us for the defendant to believe that the excusal was race related, and, therefore, the defendant cannot be deemed to have waived a *Batson* hearing for his failure to seek a *Batson* hearing immediately after her voir dire. Whether a *Batson* hearing was waived at some point prior to the Perry voir dire is a question of fact for the trial court to determine and depends on the questions that were asked and the answers that were given by other.venirepersons.[9] While we realize that a significant amount of time has passed since the voir dire of Spruill and the voir dires intervening between Spruill and Perry, the parties involved can rely on the transcript, recordings and any notes they have retained to refresh their memories. See *Stanley* v. *State*, supra, 313 Md. 50. We cannot review the court's denial of a hearing without a finding of subsidiary facts by the court that the defendant did or did not waive his right. In the event the court finds the defendant's request for a *Batson* hearing was not waived, a *Batson* hearing must be held.

Although we have concluded that the trial court in this case must determine if a *Batson* hearing was waived as to Spruill and, if it finds the hearing was not waived, to conduct such a hearing, because of the importance of *Batson* type hearings, and under our general supervisory powers, we hereby establish the following procedure for future cases. See *State* v. *Holloway*, supra, 209 Conn. 645–46.

---

[9] The same questions and answers may also become relevant, in the event a *Batson* hearing is ordered by the court, to the burden of the defendant to show purposeful discrimination. See *State* v. *Gonzalez*, supra, 206 Conn. 399.

Because factual patterns will vary from case to case as to when a *Batson* hearing should have been timely requested, or otherwise be deemed waived, a defendant should preserve his right to a hearing by alerting the trial court and the state when a member of the cognizable group has been peremptorily challenged that a later request for a *Batson* hearing may be made. This will afford the state, a defendant and the court the opportunity to note the circumstances of the particular voir dire, in case a *Batson* hearing is requested later, while making it unnecessary actually to hold a hearing at the time. The state will be better able to explain its race-neutral reasons and a defendant will be in a better position, with the comparative knowledge that only the subsequent voir dires can give, to carry the burden of proving purposeful discrimination in the event of a future *Batson* hearing. The fact that the venireperson is of a particular group can then become a matter of record at the time of the exercise of the peremptory challenge but *no* hearing need ever be held unless a request for a *Batson* hearing is made at a later time when a defendant becomes aware that an earlier peremptory challenge may not have been race-neutral. If a defendant, however, should have known of the possible prejudice on the basis of the voir dire of a venireperson of the cognizable group who is struck, that defendant must assert a claim to a *Batson* hearing immediately following that voir dire or will be deemed to have waived it. If, however, a defendant could not have known of any possible prejudice on the basis of the voir dire, the right to a subsequent *Batson* hearing will not be waived if that defendant had alerted the court to the possibility immediately following the voir dire.

Because the defendant in this case may have been deprived of a *Batson* hearing concerning the state's excusal of Spruill, we must determine the appropriate

remedy, in the event that the trial court finds the defendant did not waive a hearing. The defendant argues that he is entitled to a new trial if there should have been a *Batson* hearing.

The remedy after a trial is over for the failure to grant a *Batson* hearing is either a remand so that the hearing may be held, or a new trial. In those instances where no *Batson* hearing was held, the weight of authority provides the remedy of remand so that the state may belatedly give its neutral explanation and the defendant its argument that the state's explanation is a pretextual mask for discrimination. *Wright* v. *State*, supra, 186 Ga. App. 104; *People* v. *Lockhart*, 201 Ill. App. 3d 700, 558 N.E.2d 1345 (1990); *Stanley* v. *State*, supra, 313 Md. 50. If it is almost certain that the defendant can prove by a fair preponderance of the evidence that there is an improper motive for the peremptory challenge, there is authority for granting a new trial. See *Tursio* v. *United States*, supra, 634 A.2d 121.

The defendant claims that he is entitled to a new trial, not only because the court did not require the state to articulate race-neutral reasons for the peremptory challenge of Spruill, but also because the trial court required him to prove that there had been a systematic exclusion of black venirepersons by the state. Because the striking of even one juror is sufficient for a successful *Batson* challenge; *State* v. *Gonzalez*, supra, 206 Conn. 400; the defendant is not required to establish a systematic exclusion of black venirepersons in order to prevail under *Batson*. This rule, however, does not preclude the defendant from proving discrimination by showing such a pattern of discrimination by the state.

Here, the defendant was attempting to prove discrimination by establishing that the state had excluded a disproportionate number of black venirepersons,

which is one of the factors used to test whether there is discrimination as enunciated in *State* v. *Gonzalez*, supra, 206 Conn. 400. This claim will of necessity become a factor in the *Batson* hearing we have ordered in the event the defendant is entitled to one as to Spruill and need not be addressed here.

We conclude that the remedy for a failure to hold a *Batson* hearing is a remand to hold such a hearing, rather than a summary grant of a new trial. A remand leaves the judgment of conviction intact until such time as discrimination is in fact shown and preserves the rights of both the state and the defendant, while at the same time conserving judicial resources. A new trial is required when it has been established that a fundamental right has been violated. Here, it is not yet known whether a right has been taken from the defendant or a potential juror.

The defendant also claims that the state discriminatorily used a peremptory challenge to excuse Perry. As evidence of this discrimination, the defendant asserts that persons with the same or similar characteristics but not the same race as Perry were not struck.

The defendant refers to other venirepersons, chosen to serve on the jury, who commented on the use of self-defense. "James Mitchell, for example, agreed that an individual has a right to exercise physical force to defend himself under certain circumstances and stated 'this is America, that's what it's all about.' Similarly, Floyd Brown stated that he would not run from a fight and, if threatened, he would 'come out on top.' " The defendant further notes that, in fact, all of the witnesses questioned on the issue of self-defense agreed that under certain circumstances a person had a right to defend himself.

The defendant's argument fails, however, because a belief in the right to defend oneself is not the equivalent of the view that it takes two to fight. The concerns that the prosecutor raised as race-neutral reasons for excusing Perry, that Perry might be lenient with fights and that Perry might think that no one was at fault for a fight, would not necessarily apply to those jurors who expressed positive views on self-defense.

The defendant also argues that because the defense elicited most of the testimony concerning the jurors views on self-defense, any race-neutral reasoning based on this issue must be pretextual. It does not matter, however, which party questioned the venireperson on the issue of self-defense. The state is not limited to striking jurors only because of responses to the questions that it asks. Further, the record indicates that the venirepersons were consistently asked by at least one of the parties about their views on self-defense. If it happened to be the defendant who asked the questions, it does not mean that it was not a concern to the state.

The defendant, next, claims that the state's reasons for excusing Perry must have been pretextual because the state found acceptable jurors who had similar educational and occupational backgrounds as Perry. "For instance, Mr. Floyd Brown had been a truck driver for thirty-one years. Kenneth Pierce worked as a retired railroad worker who worked in the freight yards in New Haven. . . . Michael Hofmeister . . . attended trade school to become a tool maker . . . ."

The defendant fails, however, to indicate that any other member of the jury had less than a high school education. This was the stated concern of the state. Simply because jurors have similar occupations does not mean that they have similar educations.

The defendant also claims that the state's attorney did not inquire into the education of all of the potential jurors, and, therefore, any race-neutral reason based on the education of the venireperson must have been pretextual. The record, in fact, does not indicate that the state inquired into Perry's educational background, and we cannot test the finding of the trial court that the state's explanation concerning Perry's education was sufficient under *Batson*. We conclude that the trial court was correct in finding that the defendant did not sustain his burden of proving the exercise of the state's challenge of Perry was purposeful racial discrimination.

The case is remanded for further proceedings to determine whether the defendant waived his right to a *Batson* hearing as to Spruill, and, if the court determines that he did not, to hold a *Batson* hearing. In the event that the trial court finds, after the hearing, that the defendant has not sustained his burden of proving that the challenge was discriminatory, the judgment is affirmed. In the event that the court finds that the defendant has sustained his burden, the judgment of conviction is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.